IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

UNITED STATES OF AMERICA                    PLAINTIFF/RESPONDENT

    V.                         Civil No. 11-5141
                        Criminal No. 10-50110-002

AMADO CORREA-SANTOS                         DEFENDANT/MOVANT

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

On April 9, 2012, the Defendant/Movant Amado Correa-Santos (hereinafter "the Defendant") filed a pro se 28 U.S.C. § 2255 motion.  (Doc. 179.)  The Defendant was appointed counsel and counsel filed an amended § 2255 motion on December 13, 2012. (Doc. 201.)  The Government filed a Response (Doc. 203), and an evidentiary hearing was conducted on April 16, 2013.  A supplemental evidentiary hearing was conducted on May 3, 2013. The parties submitted post-hearing briefs (Docs. 215, 218), and the matter is now ripe for consideration.  The undersigned, being well and sufficiently advised, finds and recommends as follows:

**BACKGROUND**

On January 13, 2011, a second superseding four-count indictment was issued against the Defendant and five co-Defendants. (Doc. 62.)  Defendant was charged in Count One of the indictment with conspiring to distribute more than 50 grams of methamphetamine, in violation of 21 U.S.C. § § 841(a)(1), 841(b)(1)(A)(viii), and 846.

Defendant proceeded to a jury trial, represented by his appointed counsel, Mr. Drew Ledbetter, on April 12, 2011.  A

pretrial conference was conducted and a jury was selected on that date, with the trial scheduled to commence the following morning. Instead of proceeding to trial on the morning of April 13, 2011, Defendant waived indictment and pled guilty, pursuant to a written plea agreement, to an information charging him with conspiring to distribute an unspecified amount of methamphetamine, in violation of 21 U.S.C. § § 841(a)(1) and 846. (Docs. 116, 117, 120.)

On August 4, 2011, a sentencing hearing was held and Defendant was sentenced to 240 months imprisonment, five years supervised release, and a $25,000.00 fine. (Doc. 137.) Defendant did not file a direct appeal.

In the amended § 2255 motion filed by appointed counsel, Defendant argues that his trial counsel, Mr. Ledbetter, was ineffective in failing to appeal his sentence.[1] Defendant asserts that he would have appealed: (1) the denial of two points for acceptance of responsibility; (2) the application of a four point enhancement for being a leader or organizer of the offense; and (3) the attribution of 5 pounds of methamphetamine to him under the conspiracy. Defendant concedes that grounds (1) and (2) would have been weak arguments on appeal. With regard to ground (3), Defendant points out that Mr. Ledbetter objected at sentencing to Defendant being held accountable for the 5 pounds of

---

[1] Defendant raised additional grounds in his original pro se § 2255 motion, but appointed counsel advised the Court at the evidentiary that these grounds are not being pursued.

methamphetamine seized during the traffic stop of a Co-Defendant.
Defendant asserts:

> A co-defendant in this case named Mario Lopez called
> [Defendant] from Iowa and asked him if he wanted five
> pounds of methamphetamine. [Defendant] told Mario Lopez
> that he was not interested in this five pounds. This
> conversation was intercepted and recorded by federal
> agents. Despite [Defendant] declining the offer
> proposed by Mario Lopez, the District Court attributed
> the entire five pounds to [Defendant] as relevant
> conduct and he was sentenced accordingly. . . .
> [Defendant] contends that he was responsible for two
> ounces of methamphetamine . . . It is [Defendant's]
> contention that his offense level should have been at a
> level 26 based on two ounces of methamphetamine which
> was attributable to him. If [Defendant] had an offense
> level of 26 he would have been in the guideline range to
> receive a sentence of 78-97 months. Instead,
> [Defendant] was sentenced based on an offense level of
> 42 and received the statutory maximum of 240 months.
> Mr. Santos . . . would have appealed the sentence given
> to him based on the five pounds being attributed to him.

(Doc. 215 at pgs. 3-4.)

## EVIDENTIARY HEARING EXHIBITS

Defendant's Exhibit One is an affidavit signed by Mr.
Ledbetter on January 14, 2013, which affidavit the Government
attached to its response in opposition to Defendant's § 2255
motion. In this affidavit, Mr. Ledbetter stated:

> Mr. Correa-Santos was aware of the fourteen-day
> deadline to file an appeal. Counsel met with Mr.
> Correa-Santos for three hours **after his sentencing
> hearing on August 5, 2011,** to discuss his appeal rights.
> During this meeting, counsel repeatedly informed Mr.
> Correa-Santos of his right to appeal the sentence and
> the fourteen-day deadline to file a notice of appeal.
> Mr. Correa-Santos repeatedly voiced that he did not wish
> to appeal his sentence during this meeting.

> Counsel did not hear from Mr. Correa-Santos until
> October 17, 2011, when Mr. Correa-Santos contacted
> counsel by letter over two months after he was
> sentenced. (emphasis added).

Defendant's Exhibit Four is a jail log reflecting that Mr. Ledbetter did not visit Defendant at the jail following his sentencing hearing. Court's Exhibit One is Mr. Ledbetter's Criminal Justice Act ("CJA") voucher, which reflects the last time entry claimed for work on Defendant's case to be 2.5 hours on the date of the sentencing hearing.

Defendant's Exhibit Five is a letter from Defendant to Mr. Ledbetter dated October 17, 2011, inquiring: "I would like to know how my appeal is coming alone [sic]. When you done [sic] can you send me a copy of whatever you put in the court." Defendant's Exhibit Two is Mr. Ledbetter's response, dated November 1, 2011, advising the Defendant:

> I am not your appeal lawyer, and I am not working on any
> appeal in your case. You and I discussed your options
> to file an appeal after your plea and sentencing
> hearing, and you received your paperwork explaining your
> rights to an appeal. It was my understanding at that
> time that you did not want to file an appeal, and that
> you just wanted to be taken to federal prison as soon as
> possible. I advised you on your right to file an
> appeal, but it was my understanding you had no desire to
> file an appeal.
>
> I will be happy to help in any way that I can, but I
> have not been retained or appointed to represent you on
> an appeal.

## Mr. Ledbetter's Testimony

Mr. Ledbetter testified that while Defendant spoke some English, he always had an interpreter present during his conversations with Defendant. According to Mr. Ledbetter, "[Defendant] and I had a connection. I knew him very well and he knew me very well. We were able to look at each other and communicate. . . . [He] and I were good at communicating with each other." (Doc. 213 at pg. 29.) The undersigned notes that in his supplemental statement submitted in support of his CJA voucher requesting compensation in excess of the statutory limit, Mr. Ledbetter stated:

> My client did not speak English so I had to use an interpreter for every conversation and meeting. . . . The language barrier made communication more difficult. . . . My client was very distrustful of me in the beginning because I was a government appointed lawyer. He is also a very prideful person and a stubborn person. He used the language barrier at times to make the already tense situation more difficult.

(Court's Ex. 1 at pg. 8.)

Mr. Ledbetter acknowledged that his affidavit (Def.'s Ex. 1) was incorrect in stating that he met with Defendant for three hours on August 5, 2011, the day after Defendant's sentencing hearing. Mr. Ledbetter explained:

> Mr. Fowlkes [the Government's attorney] and I have discussed this. That three-hour conversation happened on the day that we changed our plea. We went . . . in the holding cell . . . of this building, we had a long conversation with Paul Cottrell [a Homeland Security Investigations agent] and one other DEA agent. Maria [Abdin], the translator, was present. Courtney Cline [a

> lawyer who assisted him in the case] was also present.
> That was the day of that long conversation.  And so Mr.
> Fowlkes and I realized this affidavit was incorrect
> after we had signed it and prepared it. . . .

(Doc. 213 at pgs. 20-21.)

When asked specifically whether he spoke with Defendant for three hours about his right to appeal on the day of the plea hearing, Mr. Ledbetter explained:

> What happened . . . was we went downstairs, and we were
> alone for – I'm guessing here, but it was an hour, maybe
> more than an hour, before Paul Cottrell and Mr. Fowlkes
> could get downstairs. . . . We talked about what was
> going to happen in the future.  We discussed that there
> would be a pre-sentence report.
>
> We discussed that we'd have the right to file objections
> to the pre-sentence report.  We discussed that there
> would be a hearing, and we discussed that he could
> appeal after that hearing.  So we had – we had a long
> conversation about the process that was coming up.  And
> I know that the appeal was a part of that conversation.

(Id. at pg. 21.)

According to Mr. Ledbetter, this was the first conversation he had with Defendant about the potential for an appeal and, during this conversation, the Defendant said, "There will be no appeal.  I just want to do my time."  (Id. at pg. 43.)  Mr. Ledbetter testified that he had other meetings with Defendant prior to the sentencing hearing and they discussed "the process, that the judge would sentence, and we would have the opportunity to appeal. . . . He never indicated that he wanted an appeal.  And on more than one occasion, he said very flatly, 'I just want to get to federal prison and do my time.'" (Id. at pg. 45-46.)

Page 6 of  26

Mr. Ledbetter testified that immediately after the sentencing hearing, he had another discussion with Defendant about the possibility of an appeal.  Mr. Ledbetter recalled that this discussion took place in the courtroom immediately after the sentencing hearing adjourned and lasted ten or fifteen minutes, "maybe not that long, even."  (Id. at pg. 25.)

Mr. Ledbetter testified that the court interpreter, Ms. Maria Abdin, translated the conversation he had with Defendant after his sentencing hearing, and Ms. Cline was also present.  Mr. Ledbetter initially testified that Defendant "told me specifically he did not want an appeal."  (Id. at pg. 24.)  Upon further questioning, Mr. Ledbetter testified:

> I . . . told him in this room if he wanted to file an
> appeal, we had a time limit to do that as the judge had
> just instructed.  And he said, "I just want to do my
> time," or something to that effect.  I can't remember
> his specific words, but the thrust of it was he was in
> a hurry to get out of county jail and get to federal
> prison and . . . do his time. He did not indicate that
> he wanted an appeal.

(Id. at pg. 26.)  When asked whether "it was Maria [Abdin] telling you he didn't want to appeal or if you got that directly from [Defendant]," Mr. Ledbetter, responded, "I can't remember if - - she probably answered me back in Spanish . . ., but it could have been [Defendant] answering me in English."  (Id. at pg. 31.)

Mr. Ledbetter acknowledged that in discussing the possibility of an appeal, it was just the procedure – "an explanation of these are the steps that are going to happen next."  (Id. at pg. 22.)

As to whether he discussed with Defendant possible issues for appeal, Mr. Ledbetter testified:

> Q.   [You] keep talking about right to appeal and him saying no. . . . To me, you've got to discuss what you would appeal.  Did you discuss *what* you would appeal? (emphasis added).
>
> A.   We . . had been discussing his right to an appeal as we went through the process, from entry of plea, through pre-sentence report, to the day of sentencing.  He knew he would be appealing the judge's decision at . . . the sentencing hearing. . . .
>
> Q.   Well, at sentencing, he gets 240 months.  If he got attributed just two ounces, I show his sentence could be as low as 78 months.  Did that discussion ever occur in court when you asked him if he wanted to appeal?
>
> A.   I don't think so.  We knew that a likely outcome at the court hearing was that that five pounds would be attributable to him.
>
> Q.   Which it was, but my question is, did you explain his alternatives in an appeal?
>
> A.   I'm not sure I went into specific alternatives for the appeal.  I know that we talked about whether or not he wanted to appeal the judge's decision, and he said no. . . .
>
> Q.   Did you ever discuss with him what issues there would be for appeal and whether an appeal would be worthwhile?
>
> A.   I'm not sure that I did. . . . [T]he substance of my talks with him about the appeal . . . [were] that whatever Judge Hendren decided to do on the day of sentencing, we would have the right to appeal.  I'm not sure I got much more specific than that.

(Id. at pgs. 28-29.)

According to Mr. Ledbetter, at the conclusion of the sentencing hearing, he told Defendant that if he ever needed anything to call him, and they shook hands and had a "warm and friendly goodbye." (Id. at pg. 44.)  Mr. Ledbetter explained that Defendant had the ability to call him collect from the jail if he changed his mind about an appeal, but, according to his law firm records, neither Defendant nor anyone on his behalf attempted to call.   The undersigned notes that in his supplemental CJA statement, Mr. Ledbetter stated, "Telephone communication was impossible because my client could not speak English, so each meeting with my client had to be in person in order for an interpreter to be present."  (Court's Ex. 1 at pg. 8.)

### **Defendant's Testimony**

Defendant denied ever having a three hour discussion with Mr. Ledbetter about an appeal prior to his sentencing hearing. Defendant testified that at his sentencing hearing:

> When the judge sentenced me, he said I had 14 days to appeal.  I asked my attorney, "What is that?"  When he was explaining that, that's when the officer said, "you've got to go because we're going to close up." That's when he said, "I'm going to go see you to talk about the appeal, and I will take you the papers."

(Doc. 213 at pg. 63.)

Defendant testified that this few minute conversation at the end of the sentencing hearing was the only time he had any discussion with Mr. Ledbetter about an appeal.  Defendant denied telling Mr. Ledbetter that he did not want to appeal and testified

that Mr. Ledbetter never came to see him after the sentencing hearing.  Defendant insisted that he would have appealed if Mr. Ledbetter had come to see him as he said he would.  When asked specifically whether he ever asked Mr. Ledbetter to file an appeal, Defendant testified:

> A.   My answer is this.  Once he said he was going to come see me, I took it as a done deal that he was going to appeal.
>
> Q.   You're still not answering my question.  You never asked Mr. Ledbetter to file an appeal on your behalf, did you?
>
> A.   No, because first I needed to know what the appeal was.
>
> Q.   So the answer is no.  You never asked him to file an appeal, did you?  Is that right?
>
> A.   It depends on the way he wants to take it.
>
> Q.   Did you ever ask Mr. Ledbetter to file an appeal on your behalf?  Yes or no?
>
> A.   Not specifically.

(Id. at pg. 68.)

As to what efforts he made to contact Mr. Ledbetter after the sentencing hearing, Defendant testified that he tried to make a collect call to Mr. Ledbetter during the 14-day period he had to appeal.  According to Defendant, "[a] machine answered that I had $30 credit following those options in Spanish, but nobody ever answered."   (Id. at pg. 66.)  Defendant testified that his cellmate offered to have his wife, "Tanya," contact Mr. Ledbetter for Defendant.  Defendant's testimony at the hearing was somewhat

confusing with regard to "Tanya's" attempts to contact Mr. Ledbetter. In his declaration submitted in support of his § 2255 motion, Defendant explained that "Tania" tried to call Mr. Ledbetter on several occasions, but he never answered her call, so she e-mailed or texted Mr. Ledbetter, and he responded that he would go visit the Defendant at the jail. Defendant testified that Mr. Ledbetter never came to visit him at the jail, and Defendant did not make any further attempts to contact Mr. Ledbetter at that juncture because he was in transport to his designated Bureau of Prisons facility.

Defendant testified that he did not attempt to contact Mr. Ledbetter again until he wrote the October 27, 2011 letter to Mr. Ledbetter, inquiring about the status of the appeal. Defendant explained that he did not write Mr. Ledbetter before this because he "didn't think it was necessary from what he had said to me." (Id. at pg. 71.) Defendant also noted that he does not know how to write, and another prisoner had to help him write the letter. Defendant was transported from the local jail on August 31, 2011, and testified that he did not arrive at his designated Bureau of Prisons facility until about a month later. Defendant testified that when he arrived at this facility he started asking other prisoners about the appeal process "[a]nd that's when they asked me, 'Did you appeal from the beginning?' And that's when I told them my attorney never showed up." (Id. at pg. 80.) Defendant

Page 11 of 26

testified that it was at this point that he decided to write Mr. Ledbetter a letter to inquire about the status of his appeal.

### Courtney Cline's Testimony

Ms. Cline testified that she and Mr. Ledbetter are law partners and that she worked with Mr. Ledbetter on Defendant's case, in the beginning, as a law clerk, and later as a licensed attorney. Ms. Cline testified that following the sentencing hearing, she, Mr. Ledbetter, Ms. Abdin, and the Defendant "kind of huddled right in front of the bench," and:

> I don't remember exactly verbatim what was said, but the context of the conversation was [Mr. Ledbetter] was making sure [Defendant] understood what had just happened at the sentencing hearing, and he explained that he did, and it was clear that – [Mr. Ledbetter] explained the appeal process very briefly, and it was clear that – from my understanding and [Mr. Ledbetter's] understanding, [Defendant] did not want an appeal. He never specifically asked for one. . . . He was very clear that he wanted to go do his time, and just wanted to go to federal prison and not appeal.

(Id. at pgs. 84-85.) Ms. Cline estimated that the conversation lasted at most between ten and fifteen minutes. Ms. Cline testified that Mr. Ledbetter did not say anything about going to see Defendant at the jail.

When questioned by the Court as to what she specifically recalled Mr. Ledbetter saying to Defendant about an appeal and what Defendant said in response, Ms. Cline testified:

> A.   [Mr. Ledbetter] told [Defendant] [that] he had the 14 days to appeal if he wished to do so, and he could . . . contact him. And he

made sure he had his contact information.  We
were never contacted. . . .

Q.   And what did [Defendant] say in response to
     that? . . .

A.   He said okay.

Q.   All you can recall him saying is okay?

A.   I don't remember exactly.  I'm just
     paraphrasing a conversation.  It just [was]
     understood that he – he did not – he did say
     he understood what the appeal was.

Q.   He did say "I understand what an appeal is"?

A.   I don't know if he said that verbatim, but it
     was – it was just obvious.

Q.   Well, I need you to explain to me why it's
     obvious because that's greatly in dispute
     here.

A.   Yes, Your Honor.

Q.   So what do you recall Mr. Santos saying?  Did
     he say just "Okay"?  Did he say "I don't want
     to appeal"?  What do you recall?  Or do you
     just not recall?

A.   I guess I – I can't recall. . . .

Q.   You said it was clear he didn't want to
     appeal.  So if you don't remember what his
     response was, why was it clear that he did
     not want to appeal?

A.   I don't remember whether [Mr. Ledbetter] said
     that day right then in that . . . brief
     amount of time "Amado, do you want to appeal
     this."  He explained the process for an
     appeal and made sure that he understood,
     asking if he understood.  He said he
     understood the appeal process, but he did not
     state that he wanted to appeal.  And [Mr.
     Ledbetter] – they said goodbye. [Mr.

Ledbetter] said, "If you need me, you can contact me," and he said, "Okay." . . .

Q.   So when you . . . testified it was clear he did not want an appeal.

A.   I think I'm using that in just context from all of the conversations that we had with him.  We met with him many times, and we knew – we just had a good rapport.  And as Drew testified earlier, we just kind of understood each other.

Q.   But from anything Mr. Santos said that day, was it clear . . . that he did not want to appeal?

A.   Not specifically. . . .

Q.   Does [a] lawyer have a duty to consult about what [a Defendant] could appeal?

A.   Yes.

Q.   Was that done in [Defendant's] case?

A.   Yes.

Q.   When?

A.   Probably that . . . afternoon after the change of plea.

Q.   Before sentencing?

A.   Yes. . . .

Q.   Did Mr. Ledbetter ever consult with [Defendant] about what could be appealed if sentencing did not go his way?

A.   I believe so.

Q.   When, and what was the consultation?

A.   [Mr. Ledbetter] explained that if [Defendant] did not like or did not agree with the sentence that Judge Hendren placed upon him,

it was appealable, and they could appeal that
sentence.  That it was completely up to Judge
Hendren what range was given to [Defendant]
and it was appealable.  I know that [Mr.
Ledbetter] explained that to him. . . . prior
to sentencing. . . . I don't know if it was
after or before the pre-sentence report.

(<u>Id.</u> at pgs. 90-94.)

### **Maria Abdin's Testimony**

At the supplemental hearing scheduled in this matter, Ms.
Abdin testified that she has interpreted for this Court since
2005, and she served as the interpreter at Defendant's sentencing
hearing.  Ms. Abdin testified that if the Defendant and his
attorney had a conversation following the sentencing hearing, she
would have been there to interpret it, but she did not recall the
contents of any such conversation.  According to Ms. Abdin,
attorneys and clients usually do not have more than just a few
minutes to communicate following a hearing because the U.S.
Marshals come and take the Defendant immediately after the
hearing.

Ms. Abdin recalled meeting with Mr. Ledbetter and Defendant
in a holding cell downstairs the day of the plea hearing.  Ms.
Abdin did not recall the meeting lasting more than a half-hour.
When asked whether it was possible that it lasted three hours, Ms.
Abdin testified that it was possible, but she did not think it
could have been a three-hour meeting.  As to the nature of the
meeting, Ms. Abdin testified that Mr. Ledbetter, Mr. Fowlkes and

Mr. Cottrell were there, as well as some other agents, and she believed they were trying to ask Defendant some questions about his brother and about a truck.  When asked whether Defendant's right to appeal was discussed during this meeting, Ms. Abdin testified that the "conversation was of a different nature.  I don't think they were talking about the rights . . . of appeal at that point, because I don't think we had gotten to the sentencing at that point."  (Doc. 214 at pg. 13.)

## APPLICABLE LAW

Ineffective assistance of counsel claims generally require a Defendant to show that his counsel's performance "fell below an objective standard of reasonableness" and that he was prejudiced by this deficiency.  See Strickland v. Washington, 466 U.S. 668, 687-88 (1984).  However, an attorney's failure to file a notice of appeal after being instructed to do so by his client constitutes ineffective assistance entitling a Defendant to § 2255 relief, and no inquiry into prejudice or likely success on appeal is necessary.  See Watson v. United States, 493 F.3d 960, 963-64 (8th Cir. 2007).  For a Defendant to succeed on such a claim, he must show that he made his desire to appeal evident to his attorney.  See Yodprasit v. United States, 294 F.3d 966, 969 (8th Cir. 2002).  "A bare assertion by the [Defendant] that he made a request is not by itself sufficient to support a grant of relief, if evidence that the fact-finder finds to be more credible indicates the

contrary proposition." Barger, 204 F.3d 1180, 1182 (8th Cir. 2000). A court is required to conduct an evidentiary hearing before making such factual determinations. See Watson, 493 F.3d at 964.

Where a Defendant has not specifically requested an appeal, the reasonableness of counsel's conduct is judged by whether counsel had a duty to consult the Defendant about the possibility of an appeal. See Roe v. Flores-Ortega, 528 U.S. 470, 478 (2000). The term "consult" "convey[s] a specific meaning – advising the Defendant about the advantages and disadvantages of taking an appeal, and making a reasonable effort to discover the Defendant's wishes." Id. The duty to consult is triggered where there is reason to believe that a rational Defendant would want to appeal or where the client has reasonably demonstrated an interest in appealing. See id. at 480. The Supreme Court in Roe observed, "We expect that courts evaluating the reasonableness of counsel's performance using the inquiry we have described will find, in the vast majority of cases, that counsel had a duty to consult with the defendant about an appeal." Id. at 481. To show prejudice, a Defendant must demonstrate that there is a reasonable probability that, but for counsel's deficient failure to consult with him about an appeal, he would have timely appealed. Id. at 484. While showing nonfrivolous grounds for an appeal may give weight to the contention that the Defendant would have appealed,

such a showing is not required to satisfy the prejudice requirement where there are other substantial reasons to believe that the Defendant would have appealed.   As the Court in <u>Roe</u> observed:

> [I]t is unfair to *require* an indigent, perhaps *pro se*, defendant to demonstrate that his hypothetical appeal might have had merit before any advocate has ever reviewed the records in his case in search of potentially meritorious grounds for appeal.  Rather, we require the defendant to demonstrate that, but for counsel's deficient conduct, he would have appealed.

<u>Id.</u> at 486.

### DID THE DEFENDANT EXPRESS A DESIRE TO APPEAL?

According to the Defendant, the only conversation he ever had with Mr. Ledbetter about an appeal was the brief conversation following the sentencing hearing when the sentencing judge advised him that he had 14 days to appeal and Defendant asked Mr. Ledbetter, "What is that?"  Defendant testified that Mr. Ledbetter started to explain, but did not get a chance to because Defendant was escorted away by the Marshal's Service.  Defendant testified that Mr. Ledbetter stated he would go to the jail to talk to the Defendant about the appeal, but Mr. Ledbetter never did so. Defendant acknowledged that he did not specifically ask Mr. Ledbetter to file an appeal, explaining that "first I needed to know what the appeal was," and "[o]nce he said he was going to come see me, I took it as a done deal that he was going to appeal."  (Doc. 213 at pg. 68.)

By Defendant's own admission, he did not specifically request that Mr. Ledbetter file an appeal.  According to Defendant, he did not get the opportunity to do so because Mr. Ledbetter never came to see him at the jail as he said he would.     T h e   n e x t question then is whether Defendant advised Mr. Ledbetter that he did *not* want to appeal.  Defendant denied telling Mr. Ledbetter that he did not want to appeal and insisted that he would have appealed if Mr. Ledbetter had come to see him at the jail as he said he would.  The undersigned credits Defendant's testimony on this issue.  Mr. Ledbetter appeared to have difficulty recalling the details of when and where he discussed the possibility of an appeal with Defendant, and also had difficulty recalling what Defendant specifically said with regard to whether or not he wanted to appeal.

Initially, Mr. Ledbetter stated in an affidavit that he met with the Defendant the day after the sentencing hearing (which meeting would have had to have taken place at the jail); that he discussed Defendant's appeal rights with him for three hours; and that Defendant "repeatedly voiced that he did not wish to appeal his sentence during this meeting."  (Def.'s Ex. 1.)  At the hearing, Mr. Ledbetter explained that he was mistaken in his affidavit and that this meeting actually occurred in the holding cell at the courthouse (not at the jail) on the day of Defendant's change-of-plea hearing (not the day after sentencing); that the

conversation was actually about the process that would follow the plea - - the issuance of a pre-sentence report, the right to file objections, a sentencing hearing, and Defendant's right to appeal after the hearing; and this conversation lasted only an hour or so (not three hours).  Ms. Abdin, who Mr. Ledbetter testified was present to interpret during this meeting, did not believe the meeting lasted more than half an hour.  Further, Ms. Abdin recalled the conversation being of a "different nature" and did not recall talking about Defendant's appeal rights during this meeting.

As to the conversation he had with Defendant following the sentencing hearing, Mr. Ledbetter initially testified that Defendant "told me specifically he did not want an appeal." (Doc. 213 at pg. 24.)  Mr. Ledbetter subsequently acknowledged, however, that he could not remember the Defendant's specific words, but he said something to the effect of "I just want to do my time, . . . the thrust of it was he was in a hurry to get out of county jail and get to federal prison and - - do his time.  He did not indicate that he wanted an appeal." (Id. at pg. 26.)  Further, Mr. Ledbetter could not recall if Defendant said this directly to him or if Ms. Abdin translated it for Defendant.  Ms. Cline, who was present during the brief conversation following the sentencing hearing, likewise had difficulty recalling specifics of the conversation.  Ms. Cline initially testified that Defendant "was

very clear that he wanted to go do his time, and just wanted to go to federal prison and not appeal." (Id. at pgs. 84-85.) Upon further questioning, however, Ms. Cline acknowledged that she could not recall whether Mr. Ledbetter specifically asked Defendant "in that . . . brief amount of time" if he wanted to appeal and she could not recall anything specifically that Defendant said during that conversation which supported her belief that it was "clear" he did not want to appeal.

Further, Mr. Ledbetter's testimony at the hearing was inconsistent with certain statements he made in his supplemental CJA statement. Specifically, Mr. Ledbetter testified that he and Defendant had a "connection . . .[,] were able to look at each other and communicate[,] . . . [and] were good at communicating with each other." (Doc. 213 at pg. 29.) However, in his CJA statement, Mr. Ledbetter emphasized the difficult relationship he had with Defendant as grounds for an attorney fee award higher than the statutory limit - - stating that the language barrier made communication difficult; that Defendant was, at least initially, distrustful of him; and that Defendant was stubborn and used the language barrier "at times to make the already tense situation more difficult." (Court's Ex. 1 at pg. 8.) Mr. Ledbetter also testified that Defendant had the ability to call him collect from the jail if he changed his mind and decided he wanted to appeal. However, in his CJA statement, Mr. Ledbetter

represented to the Court that all meetings had to be in person because Defendant could not speak English and "[t]elephone communication was impossible." (Id.)

Based upon the foregoing discrepancies and inconsistencies in Mr. Ledbetter's affidavit, supplemental CJA statement, and his testimony, as well as discrepancies and inconsistencies in Ms. Cline's testimony, the undersigned credits Defendant's testimony and finds that Defendant did not advise Mr. Ledbetter that he did not want to appeal. The undersigned must, therefore, next address whether Mr. Ledbetter had a duty to consult with Defendant about the possibility of an appeal and whether he fulfilled that duty.

### DUTY TO CONSULT

As stated above, the Supreme Court has observed that "in the vast majority of cases, . . . counsel ha[s] a duty to consult with the defendant about an appeal." Roe, 528 U.S. at 481. The undersigned believes that the duty to consult was triggered in this case under the standard set forth in Roe, as there is reason to believe that a rational Defendant in Defendant's position would want to appeal. Defendant received the statutory maximum sentence, and thus, had nothing to lose by appealing his sentence and challenging the denial of acceptance of responsibility, the enhancement for being a leader or organizer of the offense, and the drug quantity attributed to him. While Mr. Ledbetter testified that Defendant did not want to appeal because "he was in

a hurry to get out of county jail and get to federal prison" (Doc. 213 at pg. 26), the undersigned does not find this to be credible. Once a Defendant is sentenced, he is committed to the custody of the Bureau of Prisons.  See 18 U.S.C. § 3621(a).  Thus, filing an appeal would not have delayed Defendant's transfer to federal prison and such a baseless concern would not have dissuaded a rational Defendant from pursuing an appeal.

Having found that Mr. Ledbetter had a duty to consult with Defendant about an appeal, the next question then is whether Mr. Ledbetter fulfilled this duty.  Mr. Ledbetter acknowledged that he did not discuss with Defendant what issues they could appeal and did not get "much more specific" than to explain to Defendant that "whatever Judge Hendren decided to do on the day of sentencing, we would have the right to appeal." (Doc. 213 at pgs. 28-29.)  This discussion did not fulfill Mr. Ledbetter's duty under Roe, 528 U.S. at 478, to advise the Defendant about the advantages and disadvantages of appealing and to make a reasonable effort to discover the Defendant's wishes.  Cf. United States v. Van Pham, 722 F.3d 320, 324 (5th Cir. 2013) (counsel failed to reasonably consult with Defendant about an appeal; at most counsel discussed an appeal in the abstract and even then did so only before the sentence was pronounced); Thompson v. United States, 504 F.3d 1203, 1207 (11th Cir. 2007) (after sentencing, counsel reiterated that Defendant had a right to appeal, but stated that he did not

think an appeal would be successful or worthwhile, and Defendant said "fine"; the content of this exchange did not constitute adequate consultation, as no information was provided from which the Defendant could have intelligently and knowingly either asserted or waived his right to an appeal and no reasonable effort was made to discover Defendant's informed wishes regarding an appeal); Miller v. United States, 150 F. Supp.2d 871, 880 (E.D. N.C. 2001) (brief comment by attorney after sentencing that defendant could appeal but she did not think it would help did not satisfy attorney's duty to consult; statements to Defendant in advance of sentencing that he would have a right to appeal a sentence as of then not yet imposed also did not satisfy the consulting obligation). The next and final question the undersigned must address then is whether Defendant was prejudiced by Mr. Ledbetter's failure to consult with him about an appeal.

### PREJUDICE

The undersigned believes that Defendant has met his burden of demonstrating that there is a reasonable probability that, but for Mr. Ledbetter's failure to consult with him about an appeal, he would have timely appealed. See Roe, 528 U.S. at 484. As pointed out above, Defendant had no reason not to appeal and there were sentencing issues that certainly would have provided grounds for an appeal. Roe does not require Defendant to demonstrate that his appeal would have been successful. Further, the undersigned

credits Defendant's testimony that he would have appealed if Mr. Ledbetter had come to see him at the jail as he said he would, and that he attempted to contact Mr. Ledbetter about the appeal by telephone and through his cellmate's wife prior to being transported to federal prison.   Defendant's subsequent letter to Mr. Ledbetter indicates that he believed Mr. Ledbetter had, in fact, filed an appeal for him, as Defendant asked how the appeal was "coming alon[g]" and asked for a copy of whatever Mr. Ledbetter had filed with the Court.   The undersigned, therefore, finds that Defendant was prejudiced by Mr. Ledbetter's deficient failure to consult with him about an appeal.

### CONCLUSION

Based on the foregoing, the undersigned concludes that the Defendant is entitled to relief on his claim that Mr. Ledbetter was ineffective in failing to consult with him about an appeal. Accordingly, the Defendant is entitled to be re-sentenced.   See Barger, 204 F.3d at 1182.   The undersigned, therefore, recommends that Defendant's § 2255 motion be **GRANTED** and that Defendant's sentence be vacated and a new sentencing hearing be scheduled. The time for the Defendant to appeal will then run from the date entry of the new judgment.

**The parties have fourteen days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).   The failure to file timely objections may**

result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.

DATED this 15th day of November, 2013.


/s/ *Erin L. Setser*
_____
HON. ERIN L. SETSER
UNITED STATES MAGISTRATE JUDGE